AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  16-sw-05995-NYW |
| An Apple iMac computer, Model Number A1312, Serial Number YD011FVE5PE, more fully described in Attachment A, attached hereto. | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A, which is attached to and incorporated in this Application and Affidavit,

located in the _____ State and _____ District of _____ Colorado _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, which is attached to and incorporated in this Application and Affidavit.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Possession with Intent to Distribute and Distribution of a Controlled Substance |
| 21 U.S.C. 843(b) | Unlawful Use of a Communication Facility |
| 21 U.S.C. 846 | Conspiracy to Violate the Controlled Substances Act |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
s/ Blake Schnitker
*Applicant's signature*

_____
Blake Schnitker, Special Agent, HSI
*Printed name and title*

attested to, and acknowledged by reliable electronic means
Sworn to ~~before me and signed in my presence~~.

Date:  **04 Nov 2016**

_____
*Judge's signature*

City and state:  Denver, Colorado

Nina Y. Wang
United States Magistrate Judge
*Printed name and title*

**<u>ATTACHMENT A</u>**

SUBJECT DEVICE 4 is an Apple iMac computer, Model Number A1312, Serial Number YD011FVE5PE, which was located on the desk in the second room within the front office and was seized during the execution of the federal search warrant at 4900 Acoma Street, Unit A, Denver, Colorado, on November 2, 2016.



## ATTACHMENT B
## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

On the SUBJECT DEVICE described in Attachment A, the following items, that constitute evidence of the commission of criminal offense(s); contraband, the fruits of crimes, and things otherwise criminally possessed; and property designed or intended for use or which is or has been used as the means of committing criminal offense(s), namely, violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846:

1.  Tracking data related to the UPS parcel bearing tracking number 1ZR62R286892407756, or any parcel delivered to 4900 Acoma Street, Unit A, Denver, Colorado, by UPS, FedEx, USPS, or any other commercial shipper;

2.  Any Internet communication or browsing history related to:

    a.  DISENOS DE CARTON PATRIA, AV DE LA PATRIA NO 124, 45020 ZAPOPAN, MEXICO;
    b.  FERNANDEZ MONTES DE OCA, TONALTECAS #119 -A PLANTA ALTA COL TONALA, TONALA JALISCO 45404;
    c.  Artesanías Colibrí;
    d.  A Facebook page associated with Artesanías Colibrí, to include a page with the address facebook/VelasColibrí;
    e.  artesanias_colibri@hotmail.com;
    f.  Phone number "36027426;"
    g.  Phone number "3311472986;"
    h.  Phone number "3317223434;"
    i.  Phone number "2092306589;"

3.  Lists of narcotics suppliers or customers, either specifically enumerated or in coded language, and related identifying information;

4.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

5.  Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

6.  Any information regarding the schedule or travel of Gerardo PEREZ, Luis PEREZ, Manuel PEREZ-ROSAS, Oscar PEREZ-SALAZAR, and any other member of this conspiracy;

7.  All bank records, checks, credit card bills, account information, and other financial records;

8.  Stored names, telephone numbers (including numbers from outgoing, incoming, and missed call lists) and e-mail addresses, if applicable, contact lists, records of telephone calls, and any other part of the electronic memory of the telephone which contains information relating to the Subject Offenses;

1

9.      Address book information;

10.     Stored voice mail, text, and e-mail messages relating to the Subject Offenses;

11.     Photographs and video of associates, property, or other items related to the Subject Offenses within the date range identified herein, including any and all embedded data within those items; other stored information reflecting communications regarding illegal activities among and between members and associates involved in the Subject Offenses;

12.     To the extent that the SUBJECT DEVICE can access and store electronic files generated by computers, agents will also search for:

   a) Electronically-stored documents and records listing or displaying physical and electronic addresses used for sending or receiving mail, to include e-mail contact lists;

   b) Any and all records and materials, in any format and media (including, but not limited to stored text or PDF documents, e mail, chat logs and electronic messages), pertaining to the Subject Offenses and the disbursement and/or concealment of payment and proceeds associated therewith;

   c) Stored documentation evidencing use or ownership of the device, and stored documentation evidencing ownership of the personal chattel described herein, including, but not limited to: stored utility, internet and telephone bill payment information, records of payment for access to newsgroups or other online subscription services, user ID's, passwords, user accounts, stored product registration information, banking information (to include electronic bill pay accounts) and correspondence;

   d) Any and all records, in any format, relating to or showing use of any peer to peer network, to include postings on You-Tube and related social networking pages pertinent to the Subject Offenses;

13.     Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history;

14.     Evidence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software; or evidence of the lack of such malicious software;

15.     Evidence of the connection of the device to other electronic media; and

16.     Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

2

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Blake Schnitker, a Special Agent with Homeland Security Investigations (HSI), being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge and belief:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent (SA) with HSI, and have been so employed since July 2011. I have been assigned to a narcotics and smuggling group since June 2015. While employed as an HSI special agent and in previous positions, I have received training and conducted numerous investigations involving surveillance and undercover techniques, tactical operations, confidential source management, interview and interrogation, drug identification, drug field testing, asset forfeiture, controlled substances law, drug conspiracy law, electronic surveillance law, money laundering and bulk currency law, and extraterritorial law. I have conducted and assisted in investigations that targeted suppliers, buyers, and couriers of narcotics. I have also acted in an undercover capacity and participated in surveillance operations which have educated me in the methods of operation of drug trafficking organizations. Prior to joining HSI, I was a special agent with the U.S. Department of Defense, Defense Criminal Investigative Service (DCIS) from March 2008 to July 2011, where I was assigned to a joint HSI-DCIS counter proliferations group. From January 2006 to March 2008, I was a special agent with the U.S. Department of Commerce, Office of Export Enforcement (OEE). From October 2001 to January 2006, I was a special agent for the United States Department of State, Diplomatic Security Service.

2.      Your affiant has also conducted and participated in criminal investigations that involved complex criminal networks engaged in money laundering, smuggling, and drug trafficking violations. Your affiant has controlled, used, and debriefed confidential informants

concerning controlled substance violations and has conducted consensual monitoring of telephonic and spoken conversations. Your affiant has received extensive formal and informal training in investigative techniques that involve electronic media and computer investigations, preservation and search and seizure of electronic media as evidence, and has received specialized training in the enforcement of laws concerning wire and electronic communications.

3.      I affirm that I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code, and am authorized by law to conduct investigations and make arrests for offenses in Titles 8, 18 and 21 of the United States Code. Your Affiant is a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C).

4.      Your affiant is currently participating in an investigation, for *inter alia*, the following offenses: possession with the intent to distribute and distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1); unlawful use of a communication facility in committing a controlled substance offense in violation of 21 U.S.C. § 843(b); and conspiracy to possess with the intent to distribute and to distribute a controlled substance in violation of 21 U.S.C. § 846.

## PURPOSE OF THIS AFFIDAVIT

5.      Based on the evidence gathered in the investigation described below, your affiant believes that probable cause exists to establish that Gerardo PEREZ, Luis PEREZ, Manuel PEREZ-ROSAS, Oscar PEREZ-SALAZAR, and others known and unknown, have committed the following offenses: possession with the intent to distribute and distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1); unlawful use of a communication facility in committing a controlled substance offense in violation of 21 U.S.C. § 843(b); and conspiracy to possess with the

2

intent to distribute and to distribute a controlled substance in violation of 21 U.S.C. § 846 (hereinafter "Subject Offenses").

6.     This affidavit supports applications for search warrants to forensically examine four digital devices recovered during a search of Denver Restaurant Equipment, 4900 Acoma Street, Unit A, Denver, Colorado, pursuant to the execution of a federal search warrant on November 2, 2016 (SUBJECT DEVICES). The SUBJECT DEVICES are more specifically described as follows:

   a. **SUBJECT DEVICE 1**: A Night Owl Digital Video Recorder (DVR), Model Number F6DVR8, Serial Number 262A033496, which was attached to a private surveillance system at Denver Restaurant Equipment, 4900 Acoma Street, Unit A, Denver, Colorado. SUBJECT DEVICE 1 was located on a stool behind the desk in the second room within the front office and was seized during the execution of the federal search warrant at 4900 Acoma Street, Unit A, Denver, Colorado, on November 2, 2016.

   b. **SUBJECT DEVICE 2**: A Samsung Galaxy S6 Edge cellular phone, Model Number SM-G925V, IMEI 990004871063180, which was seized from the person of Luis PEREZ during the execution of a federal search warrant at Denver Restaurant Equipment, 4900 Acoma Street, Unit A, Denver, Colorado, on November 2, 2016.

   c. **SUBJECT DEVICE 3**: A Hewlett Packard (HP) Steam laptop computer, Model Number AU58Y3K, Serial Number TJ1523DJVS, which was located on top of a safe in the second room within the front office and was seized during the execution of the federal search warrant at 4900 Acoma Street, Unit A, Denver, Colorado, on November 2, 2016.

3

d.  **SUBJECT DEVICE 4**: An Apple iMac computer, Model Number A1312, Serial Number YD011FVE5PE, which was located on the desk in the second room within the front office and was seized during the execution of the federal search warrant at 4900 Acoma Street, Unit A, Denver, Colorado, on November 2, 2016.

7.      The SUBJECT DEVICES are currently being held as evidence within a law enforcement office. Based on training and experience, I know that the SUBJECT DEVICES have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT DEVICES first came into the possession of investigators.

8.      Based on the information set forth below, your affiant asserts there is probable cause to believe that, contained on the SUBJECT DEVICES, there is proof that constitutes evidence of the commission of criminal offense(s); contraband, the fruits of crimes, and things otherwise criminally possessed; and property designed or intended for use or which is or has been used as the means of committing criminal offense(s), namely, violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846. The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICE described in Attachment A for the purpose of identifying and reviewing electronically stored data particularly described in Attachment B.

9.      Your affiant believes that digital evidence which resides the SUBJECT DEVICES will further the ongoing investigation into Gerardo PEREZ, Luis PEREZ, Manuel PEREZ-ROSAS, Oscar PEREZ-SALAZAR, and others known and unknown, regarding the Subject Offenses.

10.     As this affidavit is submitted for the limited purpose of securing a search warrant authorizing the search of the SUBJECT DEVICE described in Attachment A for the items listed in

4

Attachment B, your affiant has not set forth each and every fact learned during the course of this investigation. However, facts not set forth herein are not being relied upon in reaching the conclusion that probable cause exists for the issuance of the search warrant, as requested herein, and your affiant does not request that this Court consider any facts not set forth herein in reviewing this application. All times contained herein are approximate.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

11.     Based on my training and experience, your affiant knows about the following items, hereinafter and below and in the Attachments "Device(s)."

12.     A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Cellular telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which

can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

13.      A hard disk drive ("HDD"), also known as a hard drive or hard disk, is a data storage device that consists of an external circuit board, external data, power connections, and internal glass, ceramic, or magnetically charged rotating metal platters that permanently store data even when powered off. A solid-state drive ("SSD"), also known as a solid-state disk, is a data storage device that uses integrated circuit assemblies as memory to permanently store data instead of using rotating platters.  Flash drives, flash cards, and thumb drives are digital storage devices that can connect to computers or other devices using the appropriate connection. CDs/DVDs are digital storage devices capable of storing large amounts of digital data—a user can store information onto a CD/DVD by "burning" digital data to the device using a computer CD/DVD

drive. These devices are capable of storing any electronic information including images, videos, word processing documents, programs and software, and web pages.

14.     "Computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and can include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

15.     Based on my knowledge, training, and experience, your affiant knows that computers and digital storage devices can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

16.     Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

17.     There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

        a.     Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer,

the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

18.     *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device(s) that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) were used, the purpose of the use, who used the Device(s), and

when. There is probable cause to believe that this forensic electronic evidence might be on the Device(s) because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and

9

passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.      Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain, among other things: communications with a narcotics source of supply, Internet history showing that a user of the device tracked packages containing illegal narcotics, calendar entries indicating when shipments did or are scheduled to arrive, lists of customer names and contact information, and accounting records which document money spent to purchase illegal narcotics as well as money obtained through the sale of illegal narcotics.

g.      Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format (such as saving a .pdf image file as a .doc document file), or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

10

h.      The size of the electronic storage media (commonly referred to as a hard

drive) used in home computers has grown tremendously within the last several years.

Thumb drives with a capacity of 32 gigabytes are not uncommon.  Flash cards with a

capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500

gigabytes up to 3 terabytes are not uncommon. These drives can store thousands of files,

including images and videos at very high resolution. Magnetic storage located in host

computers adds another dimension to the equation.

19.     *Need to review evidence over time and to maintain entirety of evidence.*  Your

affiant recognizes the prudence requisite in reviewing and preserving in its original form only such

records applicable to the violations of law described in this Affidavit and in Attachment B in order

to prevent unnecessary invasion of privacy and overbroad searches. Your affiant advises it would

be impractical and infeasible for the government to review the mirrored images of digital devices

that are copied as a result of a search warrant issued pursuant to this Application during a single

analysis. Your affiant has learned through practical experience that various pieces of evidence

retrieved from digital devices in investigations of this sort often have unknown probative value

and linkage to other pieces of evidence in the investigation until they are considered within the

fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of

each individual piece of the data fluctuates based upon additional investigative measures

undertaken, other documents under review and incorporation of evidence into a consolidated

whole. Analysis is content-relational, and the importance of any associated data may grow

whenever further analysis is performed. The full scope and meaning of the whole of the data is lost

if each piece is observed individually, and not in sum. Due to the interrelation and correlation

between pieces of an investigation as that investigation continues, looking at one piece of

information may lose its full evidentiary value if it is related to another piece of information, yet

11

its complement is not preserved along with the original. In the past, your affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

20.     *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device(s) consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device(s) or information from a copy of the Device(s) consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device(s) to human inspection in order to determine whether it is evidence described by the warrant.

## MODUS OPERANDI OF DRUG TRAFFICKING ORGANIZATIONS

21.     As previously stated, your affiant has had experience, training, and communications with other law enforcement personnel who specialize in the area of illegal drug trafficking and documentation and the detection of proceeds from drug trafficking. Your affiant also has experience in debriefing defendants and informants as witnesses who have personal knowledge of drug trafficking organizations. Such individuals often have personal knowledge regarding the methods of transportation and distribution of the drugs and money in large scale controlled substance distribution operations.

22.     Based on your affiant's training and experience, your affiant knows the following:

a.      That drug traffickers often maintain at their premises—including their businesses, residences, and in off-site "stash" locations—money ledgers, narcotic supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when narcotics were obtained, transferred, sold, distributed, and/or concealed;

b.      That drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product, and that these traffickers often maintain these photographs at their premises in either printed copies or as stored electronic images;

c.      There are many reasons why drug traffickers maintain evidence of their criminal activities for long periods of time. Such evidence may be innocuous at first glance (*e.g.* financial and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videos and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and

13

relevance when considered in light of other evidence. The drug trafficker may no longer

realize he still possesses the evidence or may believe law enforcement could not obtain a

search warrant to seize the evidence. The drug trafficker may also be under the mistaken

belief that he has deleted, hidden, or further destroyed any computer-related evidence.

However, that evidence may still be retrievable by a trained forensic computer expert.

d.      It is common for drug traffickers in the United States to use phones to order

shipments of illegal narcotics from Mexico, and UPS maintains a website

(https://www.ups.com), where shippers and receivers can track the progress of packages

before they are delivered. Your affiant knows the parcel in this case had a tracking number

of 1ZR62R286892407756. Your affiant personally checked the tracking information

several times for the parcel in this case using his smart phone, and saw that UPS estimated

the approximate delivery time as the afternoon of November 1, 2016. Any individual who

has the tracking number can check the UPS website using a computer, smart phone, or any

other device capable of connecting to the Internet.

e.      Members of drug trafficking organizations routinely use communication

facilities including cellular telephones, electronic mail, and text messaging to communicate

with other organization members in furtherance of their illegal goals.  During the course of

these electronic communications, organization members commonly use coded language

and references and/or encryption in an effort to elude law enforcement detection. Drug

dealers also use cellular telephones, laptop computers, and other communication devices to

maintain names, addresses, and/or telephone numbers of their associates in the narcotics

trafficking organization and customers of narcotics.

f.      Drug trafficking organizations store information pertaining to drug

trafficking activities on electronic devices, including cell phones, pagers, computers, and

external hard drives. I further know, based on my training and experience, as well as from information relayed to me during the course of my official duties, that drug trafficking organizations often retain, for long periods of time, such electronic documents and devices, in order to maintain a record of contacts, accounts, income, expenditures, assets, and drug-related debts.

g.      When drug traffickers amass large quantities of cash from the sale of drugs, the drug traffickers often attempt to legitimize these profits through the use of banks and financial institutions and their attendant services that include accounts, securities, travelers checks, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, and safety deposit boxes. Based on training and experience, I know that evidence of such financial instruments, accounts, and other methods of "laundering" drug proceeds may be stored on digital devices, such as cell phones and computers. I further know that narcotics traffickers often store electronic copies of records and receipts to such financial transactions on digital devices, such as cell phones and laptop computers.

h.      I know it is common practice for large scale narcotics traffickers to travel to their purchase and distribution areas to facilitate their trafficking; that after purchasing drugs, narcotics traffickers will transport or cause to be transported narcotics to areas in which they will distribute the drugs; and that methods of transportation include commercial shipping companies, the United States Postal Service, commercial airlines, private airplanes, trains, buses, and rental and private automobiles. I further know that narcotics traffickers often store electronic copies of records and receipts for such shipments or travel on digital devices, such as cell phones and laptop computers.

i.      Drug trafficking organizations maintain a variety of documents related to drug trafficking, including ledgers, hotel receipts, wire transfer paperwork, apartment

rental agreements, cell phone bills, passports, photographs, credit card bills, vehicle registration documents, vehicle rental receipts, utility bills, and other documents that provide evidence of the illegal conduct of such organizations. I further know that narcotics traffickers often store digital versions of such documents in electronic devices, such as cell phones and computers.

j.      Drug traffickers are increasingly using computer hardware and software to communicate with co-conspirators and to facilitate the financial transactions associated with both the narcotics deals themselves and with the laundering of the related proceeds. Computer hardware and software may contain spreadsheets of suppliers and buyers, financial records, bank account records, criminal contacts and other information relevant to the investigation of the criminal enterprise.


## SUMMARY OF CURRENT INVESTIGATION

23.     On or about October 27, 2016, at approximately 0800 hours, a UPS driver identified as Ricardo Rosas Garcia made entry into the United States via the World Trade Bridge in Laredo, Texas, driving a UPS small parcel truck bearing Mexico license plates 693DD3. Garcia presented an E-manifest trip number (UMXPMTYLRD012016102700001) to Customs and Border Protection (CBP) Officer Albino Martinez at primary lane 7. Officer Martinez processed and referred the conveyance for a Non-Intrusive examination. The conveyance and merchandise was scanned at the relocatable Vehicle and Cargo Inspection System (VACIS) and was then referred to the secondary cargo dock for further inspection. A package addressed to "GERARDO PEREZ, UNIT A DENVER, 4900 ACOMA ST, DENVER CO 80216-2027, UNITED STATES," containing candles was selected for a more intrusive inspection due to that fact it was targeted by CBP Officer John Roth based on what was seen

16

on the x-ray. The return address listed on the package was "DISENOS DE CARTON PATRIA, AV DE LA PATRIA NO 124, 45020 ZAPOPAN, MEXICO."

24.     CBP Officers also recovered a commercial invoice from the package. The commercial invoice, which was dated October 24, 2016, listed the shipper as "FERNANDEZ MONTES DE OCA, TONALTECAS #119 -A PLANTA ALTA COL TONALA, TONALA JALISCO 45404." The commercial invoice listed the consignee as "GERARDO PEREZ, 4900 ACOMA ST UNIT A DENVER, COLORADO USA 80216." The commercial invoice listed the shipper's phone number as 3317223434 and the consignee's number as 2092306589.

25.     The scented candles were scanned utilizing the Rapiscan 101 van which revealed anomalies within the candles. The sealed package was opened and two scented candles were removed from it. CBP Officers James Sobiech and Gerardo Leza used a drill to extract a white crystal like substance from each of the candles. The white crystal like substance field tested presumptive positive for the properties of methamphetamine. Upon looking into the drilled holes of the candles, cellophane was visible inside the candle. CBP Canine Enforcement Officer Oscar Mejia conducted an inspection yielding a positive alert to the presence of narcotics within the shipment of candles. CBP Officers broke apart the candles and retrieved approximately 5 pounds of methamphetamine. The matter was then referred to HSI.

26.     The following photos depict the parcel and its contents after inspection by law enforcement agents, as described above:



A photo of the label on the outside of the parcel



A photo of the candles contained within the parcel



A photo of one candle with a drill hole made by CBP agents

18



A photo of CBP agents opening the candles to examine the contents



A photo of packages of methamphetamine extracted from the candles

27.     A business card within the parcel referenced a business identified as "Artesanías Colibrí," a Facebook page with the address "facebook/VelasColibrí," an email address of "artesanias_colibri@hotmail.com," and the following phone numbers: "36027426" and "3311472986."

28.     On October 28, 2016, your affiant received information regarding the interdicted parcel from HSI SA Ben Bentancurd. SA Bentancurd advised your affiant that the parcel was sent by CBP Laredo to the HSI Denver Field Office where it was secured in the evidence vault. On October 31, 2016, your affiant viewed the parcel at the HSI Denver Field

19

Office, located at 5445 DTC Parkway, Unit 600 Greenwood Village, Colorado 80111. Upon

further inspection of the parcel, your affiant viewed the label on the outside of the package,

which listed the sender as "DISENOS DE CARTON PATRIA, AV DE LA PATRIA NO 124,

45020 ZAPOPAN, MEXICO." The recipient address was listed as "GERARDO PEREZ,

UNIT A DENVER, 4900 ACOMA ST, DENVER CO 80216-2027, UNITED STATES."

29.     Database checks reveal a 2015 GMC Sierra is registered to Gerardo PEREZ

and Oscar D. PEREZ with 4900 Acoma St., Denver, Colorado, listed as the registered address.

30.     Criminal history checks for Gerardo PEREZ revealed he was arrested in

January, 2011 for possession of cocaine. Gerardo PEREZ was convicted and served 37 months

in prison. Further checks revealed that Gerardo PEREZ was convicted in April 2008 for

distribution, possession, and the manufacture of dangerous drugs. Gerardo PEREZ has several

other arrests dating back to 2007, many of which were drug-related offenses.

31.     I know, from my training and experience, that the amount of methamphetamine

contained within the parcel is indicative of drug trafficking and is far more methamphetamine

than a mere drug user would typically possess.

32.     On November 1, 2016, the Honorable Nina Y. Wang, United States Magistrate

Judge for the District of Colorado, signed an anticipatory search warrant authorizing agents to

search 4900 Acoma Street, Unit A, Denver, Colorado, on November 1, 2016, after Special

Agents execute their plan to deliver the parcel to Gerardo PEREZ or his authorized

representative at 4900 Acoma Street, Unit A, Denver, Colorado. Magistrate Judge Wang also

signed a tracker warrant authorizing the installation and use of a GPS device in the parcel, a

transmitter to notify law enforcement when the parcel had been opened, and an invisible

powder which would luminesce when viewed with a black light so investigators could identify

who handled the package or its contents. All of these items were installed inside the parcel.

20

33.     On November 1, 2016, law enforcement agents conducted surveillance on 4900 Acoma Street, Unit A, Denver, Colorado, throughout the afternoon to determine if Gerardo PEREZ was present at the address before delivering the parcel. Agents were never able to confirm that Gerardo PEREZ was at the address once they began surveilling it on November 1. As a result, agents determined the operation would be more effective if they waited until November 2, 2016.

34.     On November 2, 2016, Magistrate Judge Wang signed a second anticipatory search warrant authorizing agents to search 4900 Acoma Street, Unit A, Denver, Colorado, on November 2, 2016, after agents execute their plan to deliver the parcel to Gerardo PEREZ or another person authorized to receive the parcel at 4900 Acoma Street, Unit A, Denver, Colorado.

35.     On November 2, 2016, HSI agents conducted a controlled delivery of the parcel to Denver Restaurant Equipment, 4900 Acoma Street, Unit A, Denver, Colorado. Before the delivery, agents re-taped in the original packaging to make it look like it was never opened by law enforcement as much as possible. An undercover (UC) agent, dressed as a UPS delivery person, delivered the parcel to 4900 Acoma Street, Unit A, Denver, Colorado. The UC agent attempted to follow the same process an actual UPS driver would (*i.e.*, enter through the front door, request a signature for delivery, then leave).

36.     Because Gerardo PEREZ was not present, Luis PEREZ signed for the parcel. He printed his name above Gerardo PEREZ's name, which was listed on the signature sheet, created by the UC. Luis PEREZ then instructed the UC to place the parcel on the floor inside of the warehouse. The UC then departed the business.

37.     Once the parcel was inside of the business, your affiant was able to monitor it via a GPS tracker placed inside of the parcel, and an audible tone emitted by the tracker via a

radio signal which emits one tone every fifteen seconds if the package is stationary, and two

back to back audible tones every fifteen seconds if the package is moving. Agents conducted

surveillance around the business for approximately three hours. During this time, the parcel

transmitted approximately ninety seconds of movement, and then it was stationary again. The

GPS tracker showed the location of the parcel outside of the warehouse, in the back lot located

on the southeast side of the building. Because the parcel had not moved in more than two

hours, the decision was made to move in and execute the search warrant.

38.     After the building was secure, agents began searching for the delivered parcel

containing the methamphetamine.  After searching for over thirty minutes, agents retrieved the

parcel from the engine compartment of a white truck, located in the back of the building on the

southeast side, as shown in the photographs below.



A photo of the front of the truck where law enforcement agents ultimately found the parcel



A photo of the side of the truck where law enforcement agents ultimately found the parcel



A photo of the parcel where law enforcement agents found it,
inside the engine compartment of a truck registered to Luis PEREZ

39.     The shipping label and commercial invoice which was contained in a plastic pocket on the outside of the parcel had been removed.

40.     Once the package was retrieved, agents began searching the rest of the premises. During the search, agents found SUBJECT DEVICE 3 and SUBJECT DEVICE 4 in the front office. During an interview with Oscar PEREZ-SALAZAR, Oscar PEREZ-SALAZAR stated he and his father, Manuel PEREZ-ROSAS were co-owners of the company.

23

Oscar PEREZ-SALAZAR stated the front office, where SUBJECT DEVICE 3 and SUBJECT DEVICE 4 were found, belonged to Manuel PEREZ-ROSAS. SUBJECT DEVICE 3 was found on top of a safe located in the office. Inside of the safe, agents found and seized approximately forty-seven grams of a substance that field tested presumptive positive for cocaine. During an interview with Manuel PEREZ-ROSAS, Manuel PEREZ-ROSAS stated that the front office was his and the safe was shared by himself and his son, Gerardo PEREZ. Manuel PEREZ-ROSAS stated the cocaine belonged to Gerardo PEREZ. Your affiant believes SUBJECT DEVICE 3 and SUBJECT DEVICE 4 may contain, *inter alia*, evidence regarding past shipments as well as evidence that Gerardo PEREZ, Luis PEREZ, Manuel PEREZ-ROSAS, or Oscar PEREZ-SALAZAR tracked the parcel which was delivered by the UC on November 2, 2016. Such evidence is more specifically identified in Attachment B.

41.     During interviews with Oscar PEREZ-SALAZAR, Manuel PEREZ-ROSAS, and Luis PEREZ, they all denied knowing how the parcel containing the methamphetamine ended up in the engine compartment of the white truck. Luis PEREZ stated that Gerardo PEREZ arrived at the business approximately thirty minutes after the parcel was delivered by the UC. Luis PEREZ stated he and Gerardo PEREZ spent a few minutes at the business, went to lunch, and then came back to the business. Luis PEREZ stated that Gerardo PEREZ was nervous about being on time for an appointment with probation to get his GPS ankle bracelet put on, and asked Luis PEREZ for a ride. Luis PEREZ stated he could not give Gerardo PEREZ a ride and said Gerardo PEREZ departed the business after calling a friend to pick him up. Luis PEREZ stated that Gerardo PEREZ was on probation for a DUI conviction.

42.     Agents seized SUBJECT DEVICE 2 from Luis PEREZ, and believe it may contain, *inter alia*, evidence that Luis PEREZ tracked the shipment of the parcel and communications between Luis PEREZ and Gerardo PEREZ regarding the delivery of the

24

parcel, given the timing of Gerardo PEREZ's arrival to the business approximately thirty minutes after Luis PEREZ received the parcel from the UC agent.

43.     SUBJECT DEVICE 1 was found in Manuel PEREZ-ROSAS office, where it was connected to a video surveillance system at the business. Agents observed cameras installed in multiple locations throughout the business including one located in the back (east side of the building) facing the direction of the white truck where investigators found the parcel. Your affiant believes that video footage of the individual who moved the parcel from the warehouse to the engine compartment of the white truck will be contained on SUBJECT DEVICE 1. Additionally, your affiant believes SUBJECT DEVICE 1 may contain additional video recordings of the employees of Denver Restaurant Equipment engaging in conduct related to the receipt and distribution of illegal narcotics, including prior shipments of controlled substances. The parties' conduct with regard to the parcel suggests they were aware of its contents without even having to open it.

44.     Manuel PEREZ-ROSAS, Luis PEREZ, and Oscar PEREZ-SALAZAR all told investigators they never received packages from Mexico at Denver Restaurant Equipment. Based on computer indices checks, your affiant has learned Gerardo PEREZ has received at least one other package via UPS from Mexico. Denver Restaurant Equipment has only been located at 4900 Acoma Street, Unit A, Denver, Colorado, since approximately May or June 2016.

## CONCLUSION

45.     Based on the investigation described above, probable cause exists believe that Gerardo PEREZ, Luis PEREZ, Manuel PEREZ-ROSAS, Oscar PEREZ-SALAZAR, and others known and unknown, have committed or are in the process of committing the following offenses:

25

possession with the intent to distribute and distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1); unlawful use of a communication facility in committing a controlled substance offense in violation of 21 U.S.C. § 843(b); and conspiracy to possess with the intent to distribute and to distribute a controlled substance in violation of 21 U.S.C. § 846.

46.     Based on the aforementioned facts, and on your affiant's training and experience, your affiant submits there is probable cause to believe that evidence related to violations of Title 21, United States Code, Sections 841, 843, and 846, as identified in Attachment B, is presently located on the SUBJECT DEVICE identified in Attachment A.

47.     Your affiant respectfully requests that the Court issue a search warrant, which authorizes the forensic search of the SUBJECT DEVICE identified in Attachment A, for items described in Attachment B.

I, Blake Schnitker, an HSI Special Agent, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

<u>s/ Blake Schnitker</u>
Special Agent Blake Schnitker
Department of Homeland Security
Immigration and Customs Enforcement
Enforcement, Homeland Security Investigations

Submitted, attested to, and acknowledged by reliable electronic means on
_____November 4_____ , 2016.

NINA Y. WANG
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

This Application and Affidavit was reviewed and submitted by AUSA Peter McNeilly.

26